UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Maurice Franklin,

    *Plaintiff,*

v.

Maximus, Inc. et al.,

    *Defendants.*

No. 21 CV 4367

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Maurice Franklin ("Franklin") brings this suit against his former employer, Maximus, Inc., and its affiliates Maximus Services LLC and Maximus Human Services, Inc. ("Maximus") for retaliation and discrimination based on his race under Title VII of the Civil Rights Act ("Title VII") and Section 1981 of the Civil Rights Act of 1881, 42 U.S.C. § 1981, and interference with his rights under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq*. [Dkt. 151.][1] Before the Court are the parties' cross motions for summary judgment. [Dkts. 181, 185.] For the reasons stated below, Maximus' motion is granted and Franklin's motion is denied.

## I.    Local Rule 56.1

First, Maximus makes several Local Rule 56.1 objections. Local Rule 56.1 instructs parties on summary judgment procedures, including how to properly present facts to the Court. It exists to streamline summary judgment. For example, parties must file statements of facts distilling evidence into numbered paragraphs

---

[1]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

that cite to the record. Local Rule 56.1(d). Local Rule 56.1(g) then requires parties'
briefs to "cite directly to specific paragraphs in the LR 56.1 statements or responses"
when addressing facts. These rules are important for everyone. They help the parties
present their strongest case. They also help the Court "organiz[e] the evidence and
identify[ ] disputed facts," negating the need to "scour the record." *Fed. Trade Comm'n
v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633–34 (7th Cir. 2005). Consequently,
courts are not shy to strike briefs or disregard factual assertions that shirk Local Rule
56.1. *See, e.g.*, *Gross v. Peoples Gas Light & Coke Co.*, 634 F. Supp. 3d 464, 475–76
(N.D. Ill. 2022) (disregarding factual assertions citing to summary judgment record);
*Pursley v. City of Rockford*, 2024 WL 1050242, at *15 n.13 (N.D. Ill. Mar. 11, 2024),
*reconsideration denied*, 2024 WL 1521451 (N.D. Ill. Apr. 8, 2024) (same); *Komaniecki
v. Ill. Tool Works, Inc. Ret. Accumulation Plan*, 2023 WL 6198817, at *3 (N.D. Ill.
Sept. 22, 2023) (disregarding factual assertions in summary judgment briefing citing
to the record or lacking citation); *Palmer v. City of Markham*, 2023 WL 11960561, at
*2 (N.D. Ill. Feb. 24, 2023) (striking summary judgment briefs for citing directly to
the record and lacking citations).

The Court struck Franklin's initial summary judgment response [Dkt. 193]
because it lacked citations supporting factual assertions in violation of Local Rule
56.1(g) and was 15 pages too long. [Dkt. 198.] Maximus argues that Franklin's refiled
brief is still noncompliant because it lacks citations in fact-laden paragraphs. [Dkt.
201 at 4.] It's true that a few paragraphs could be better cited. [*See* Dkt. 200 at 8–10.]
But the rest of the brief is largely compliant and most uncited assertions make clear

2

what facts Franklin relies on and are identifiable in his L.R. 56.1 statements. But where factual assertions do not cite to the L.R. 56.1 statements or the record and the Court cannot tell what facts and evidence Franklin is relying on, the Court will not consider those assertions. *See Pryor by & through Cadence Bank v. Rush-Copley Med. Ctr., Inc.*, 2023 WL 3388658, at *5 (N.D. Ill. May 11, 2023).

Maximus also takes issue with Franklin's response to Maximus' statement of facts [Dkt. 194] and Franklin's statement of additional facts [Dkt. 200-1] because the former asserts new facts not included in the latter. [Dkt. 201 at 3–5.] Maximus is correct that the proper place for new evidence is in a statement of additional facts, and this can be a basis for disregarding a party's filings. *See* Loc. R. 56.1(e)(2); *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643–44 (7th Cir. 2008). That said, the Court prefers to decide cases on the merits, *see Atkins v. Gilbert*, 52 F.4th 359, 361 (7th Cir. 2022) (per curiam), and Franklin did file a separate statement of additional facts, unlike in *Ciomber*, 527 F.3d at 644. It appears that Franklin made a good faith attempt to comply with Local Rule 56.1 so the Court will not penalize slight deviations from the rule. Of course, if Maximus is correct that the new facts are unresponsive to Maximus' asserted facts, there will be no genuine dispute about them. Local R. 56(e)(3).

Finally, Maximus objects that various facts lack evidentiary support or contain impermissible legal argument. [Dkt. 201 at 5–6 (citing Dkt. 194, ¶¶ 4, 7, 13, 18–20, 22–25, 27–28, 58, 67–68, 82–84).] Where contested factual assertions are not supported by a citation to the record or rely on unsupported conclusions, inadmissible

evidence, or legal argument, the Court will disregard those facts. L.R. 56.1(e)(3) ("To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material.")

## II.    Background

The Court draws on the parties' Local Rule 56.1 statements to recount the facts at issue, which are undisputed except where otherwise noted. [Dkts. 191, 194, 202.] Because both parties have moved for summary judgment, when evaluating each motion, the Court must view the record in the light most favorable to the nonmovant. *See Frazier-Hill v. Chi. Transit Auth.*, 75 F.4th 797, 801 (7th Cir. 2023). As explained below, if the Court views the record in Franklin's favor, Maximus is entitled to summary judgment, so it is apparent that if the Court views the record in Maximus' favor, Franklin's motion must be denied. Therefore, rather than present two versions of the record, the Court presents disputed facts in the light most favorable to Franklin.

### A.    Franklin's Employment History

Maximus, Inc. provides services to federal, state, and local government agencies through its subsidiaries, including Maximus Human Services, Inc. ("MHS"). [Dkt. 194, ¶ 3.] MHS contracts with governments to provide support services for government programs. Maximus Services LLC employs people performing work for MHS, although MHS hired employees directly prior to 2018. [*Id.*] Maximus organizes employees by the projects they work on. It assigns MHS projects to employees and

4

then places employees into divisions, which fall under larger groups. [*Id.* at ¶ 4.] Relevant to this case, the Human Services group included the Child Support division, Workforce Services division, and Consulting division prior to 2021. [*Id.* at ¶ 6.] In 2016, the Child Support division expanded to include Benefits Eligibility and Advocacy Services ("BEAS"), and later also began taking on unemployment insurance ("UI") contracts with the Department of Labor. [Dkt. 182-3 (Rosenak Decl.), ¶¶ 5, 12.] Within the Child Support division, each contract was assigned to a Project Manager or Project Director, who reported to a Director or Vice President, who reported to Laura Rosenak, Senior Vice President – Human Services. [Dkt. 194, ¶¶ 8, 10.] The Human Services group reported to Kathleen Kerr, Group President of Human Services, post-2018. [*Id.* at ¶¶ 5–6.]

Franklin was employed by MHS and, after 2018, Maximus, at various points between 2001 and 2021. From 2001–2003, he was an Arrears Calculation Specialist. He was rehired in 2008 as a Supervisor – Case Management in the Child Support division. Franklin was promoted within the division to Manager – Case Management (2012), Project Manager (2014), Senior Project Manager (2016), Director – Child Support (2017), and Vice President – Child Support (2018). [*Id.* at ¶ 11.]

As Vice President – Child Support, Franklin was responsible for providing executive oversight and support to a portfolio of contracts, meeting client service-level agreement requirements and financial targets, meeting sales goals for contracts, participating in bids for new contracts, and supervising a team of employees. [*Id.* at ¶ 12.] He specialized in employer services. Until the Covid-19 pandemic, he also spent

5

60% of his time overseeing the "California Lifeline" contract with the California Public Utilities Commission. [*Id.* at ¶¶ 7, 12.]

Franklin reported to Rosenak from 2018 (when he was promoted to Vice President – Child Support) to January 1, 2021. [*Id.* at ¶ 11.] He then reported to Kelly Blaschke Treharne, Senior Vice President – Human Services, after Maximus reorganized, *see infra*. [*Id.* at ¶¶ 9, 57.]

## B.    Stith Investigation

In June 2019, Clyde Stith, a Project Director in the Child Support division, lodged a complaint against Rosenak, spurring an internal investigation. Stith complained that Rosenak was hiring people onto his team without involving him and alleged racial discrimination. [Dkt. 191, ¶ 7; Dkt. 194-2 (Colbeck Dep.) at 21:25–23:8.] The same month, Peter Baylinson, Vice President of Finance & Accounting in the Child Support division, told Franklin he would be interviewed by HR and that he needed to "go along with [Rosenak]." [Dkt. 191, ¶ 9; Dkt. 186-1 (Franklin Dep. 1) at 136:1–7.] At the time, Franklin did not know what Baylinson was referring to. [Franklin Dep. 1 at 135:21–136:7.] But he interpreted Baylinson's request to mean that Rosenak had filed a complaint against Stith. [Dkt. 194, ¶ 30.] The parties dispute whether Rosenak actually filed such a complaint. [*See* Dkt. 191, ¶¶ 6, 8.]

Around June 14, 2019, Laurie Eaton, then Director – Human Capital, interviewed Franklin about Stith's complaint. During that conversation, she asked if

Franklin had ever "observed" Stith "being aggressive or talking loud to [Rosenak]." [2] [Dkt. 191, ¶ 10; Dkt. 194, ¶ 30; Franklin Dep. 1 at 138:10–140:17.] Franklin refused to comment and said: "I ended it. I did not want to be part of it . . . I said '[p]lease leave me out of this.'" [Dkt. 194, ¶ 31.] He also stated during his deposition that he "asked to be left out of that investigation because I knew it was going to end my career." [*Id.*] Franklin believed that not supporting Rosenak could affect him negatively because she was his supervisor. [*Id.*] Relatedly, Franklin believed his relationship with Rosenak had already worsened after he'd made a series of complaints about two employees he believed were related to Rosenak between 2017 and January 2019. [Dkt. 194, ¶¶ 35–38.] Franklin complained to multiple people in HR that Rosenak was retaliating against him for these complaints. [*Id.* at ¶¶ 35, 38.]

## C. Internal and EEOC Complaints

After a leadership team meeting in February 2020, Rosenak began to consider reorganizing the Child Support division to centralize leadership by business line. She believed that eliminating "bifurcated portfolios" would allow for more consistent service, operational efficiencies, and better business development. [Dkt. 194, ¶ 39; Rosenak Decl., ¶ 12.] Rosenak had multiple conversations with Franklin about reorganization. In September 2020, she told him that Kerr, Health Services Group

---

[2] Franklin originally testified that during the conversation, Eaton also asked if Franklin had ever "observed" Stith complain of discrimination in which other people were promoted ahead of him despite him being the "most qualified African American person for the job." [Dkt. 191, ¶ 10; Franklin Dep. 1 at 141:23–142:13.] Franklin recanted in his response to Maximus' statement of facts, explaining that he did not make this statement, misconstrued facts, and that Stith did not mention racially discriminatory promotions to him until after the investigation. [Dkt. 194, ¶ 31.] Franklin did make this statement during his deposition. Rather, his objection seems to be that it was a mistakenly *untrue* statement.

President, gave her "blessing" to "begin moving in a new direction" and that she planned to have one employee oversee Child Support, one over BEAS, and one over UI if it came into the portfolio. [Dkt. 194, ¶ 41.] She stated that Colleen Matthias, a Director in the Child Support Division, would take the BEAS position since she'd already been acting in that role. When asked whether Kelly Boerner (Vice President – Operations Support) would take the lead Child Support role, Rosenak emphasized that she was positioning Franklin to be the "front person" in Child Support, but that HR wanted it to be an "open position." BEAS was different, she said, because it was a "dead market" and might be removed from her portfolio. [*Id.*] Franklin brought the reorganization up in a subsequent call, claiming Rosenak suggested the Child Support position would be posted because Franklin had "failed" to step up. Rosenak denied this and reiterated that the position would be posted because it was a bigger role with a larger salary. She also said she viewed Franklin as her successor and supported his career. [*Id.* at ¶ 42.] Rosenak also mentioned that Kerr agreed that the decision about who would lead Child Support would be done through a process "that won't be viewed as problematic." She explained that because of the Stith investigation, there was "heightened sensitivity" to ensure everyone had a chance to be considered. [*Id.*]

Nevertheless, Franklin contacted Michelle Link, Chief Human Resources Officer, alleging that there was a "lack of fairness and equity" in the reorganization because some people would be placed in new positions without having to compete while he would. It felt "retaliatory," he said, and speculated that it was because he'd

complained about employees who he believed were Rosenak's relatives. [*Id.* at ¶¶ 43–44.] Colbeck, Rosenak, and Franklin met on October 19, 2020, where Rosenak again explained that the Child Support position would be open because it was significantly different from any existing role. Franklin again rejected this. [*Id.* at ¶ 45.] In a one-on-one conversation with Colbeck, Franklin claimed that Rosenak had been retaliating against him for years ever since the Stith investigation. [*Id.* at ¶ 46.] On request, Franklin also voiced his retaliation concerns to Kerr via email, citing his opposition to perceived nepotism and refusal to engage in the Stith investigation. [*Id.* at ¶¶ 47–49.]

Rosenak's planned reorganization never happened. Instead, Kerr implemented a larger reorganization of the Human Services group (including the Child Support division), which she'd been contemplating since January 2020. [Dkt. 194, ¶ 50.] Kerr's reorganization aimed to assign contracts to divisions based on "core capabilities" instead of subject matter. [*Id.*] Contracts that required call center and case management work had different staffing and operational needs. [*Id.* at ¶ 51.] Consequently, all non-call center-related child support contracts were transferred the Workforce Services division. This included Franklin's contracts. So, he (and 200 other employees) began reporting to Kelly Blaschke Treharne Senior Vice President – Human Services, who was in charge of the Workforce Services division. [*Id.* at ¶¶ 9, 56–57.]

In February 2021, Blaschke reorganized the Workforce Services division into three teams: Employer Services, Operations East, and Operations West. She added

new executive positions ("Lead Vice Presidents") to lead each team. [*Id.* at ¶¶ 59–60.] She also created a Vice President – Operations position to provide cross-functional support to the teams. All reported directly to her. [*Id.* at ¶ 61.] Franklin applied for two positions.[3] Candidates were interviewed by a panel including Blaschke and two other Senior Vice Presidents. They also provided pre-written answers to standard questions, which were scored. [*Id.* at ¶ 63.] Franklin was not offered any position he applied to.[4] [*Id.* at ¶ 68–69.] He received the worst interview scores for both positions he was interested in, and lacked experience leading other senior leaders. [*Id.* at ¶ 70.] Successful candidates also had more years of experience as Vice Presidents at Maximus. [*Id.* at ¶¶ 68–69.] Maximus promoted Nancy Kim, Lisa Simmons, and Rachel Zietlow to the Lead VP positions.

When Blaschke called Franklin to deliver the bad news, she explained he was not promoted because he needed more experience, which other candidates had. [*Id.* at ¶ 73.] Franklin disagreed, insisting that he had done all the things Blaschke suggested. He also complained that he'd been "underpaid and overlooked" for years, and didn't "have any level of confidence" that Maximus would provide "equal opportunity for a black guy . . . Only women get promoted." [*Id.*] Franklin now maintains that the decision to promote others was racially discriminatory and retaliation by Blaschke. [*Id.* at ¶¶ 71–72.] He also maintains that Blaschke had already decided who to promote and that the panel was just a sham to make the

---

[3]     Franklin applied to Lead Vice President – Employer Services. The parties dispute which other position he expressed interest in, but the dispute is immaterial. [Dkt. 194, ¶ 65.]
[4]     After the positions were added, Franklin began reporting to Nancy Kim, the new Lead Vice President – Employer Services, in May 2021. [Dkt. 194, ¶ 74.]

process look fair.[5] [*Id.*] In their conversation, Blaschke averred that the process was impartial. Franklin disagreed and then asked whether Maximus would consider giving him a severance package. [*Id.* at ¶ 73.]

In April 2021, Franklin filed an internal ethics complaint alleging that the hiring process for the Lead Vice President positions was "flawed and biased" and that he was not selected due to racial and gender discrimination and retaliation. [*Id.* at ¶ 75.] Maximus hired an external firm to investigate his claims, finding them without merit. [*Id.* at ¶ 75, Dkt. 191, ¶ 35.] The next month, he filed an Equal Employment Opportunities Commission ("EEOC") complaint alleging racial discrimination and retaliation based on the same failure to promote allegations. [Dkt. 194, ¶ 75.] Franklin retained counsel and later took FMLA leave. [*Id.* at ¶ 77.]

## D. Severance and Lawsuit

On June 14, 2021, Franklin's counsel, Matthew Carpenter, sent a letter to Maximus Assistant General Counsel T. Isadora Huntley stating that "[c]onsidering recent developments, my Client believes that it is in the best interest of both parties to go in different directions. As such, my Client has authorized me to pursue a potential severance agreement on his behalf…" [*Id.* at  76.] The letter outlined potential Title VII claims Franklin had against the company and offered to accept a settlement payment of $400,000 in exchange for a "mutual release of claims by the

---

[5]    Franklin denies that he considered the panel's failure to pick him "retaliatory," explaining that he thought Blaschke had already decided who she wanted to promote before the interview process. [Dkt. 194, ¶¶ 71–72.] This statement is not inconsistent with believing Blaschke retaliated against him and is inconsistent with his prior deposition testimony. [Franklin Dep. 1 at 275:1–280:19.]

parties." [Dkt. 191, ¶ 34; Dkt. 182-14.] On July 16, 2021, Nathalie Ohanian, Senior Vice President – Legal Counsel, responded, explaining that Maximus' investigation of Franklin's internal ethics complaint and the claims asserted by counsel found "no evidence of any intent to discriminate . . . systematically punish or undermine [Franklin]" or "retaliation." [Dkt. 191, ¶ 35; Dkt. 187-2 at 4–5.] She agreed that it was best for the parties to amicably part ways since Franklin didn't see his "current work environment as being positive or productive." [*Id.*]

On August 6, 2021, the parties began negotiating a severance agreement. Carpenter emailed Ohanian stating that Franklin "would sign a separation agreement and mutual release for $275,000." [Dkt. 194, ¶ 78.] Ohanian sent him a copy of Maximus' standard Separation Agreement and Release that it used for employees who were laid off and eligible for severance under its severance policy. [*Id.*] After further negotiations and alterations to the agreement, Franklin signed on October 8, 2021. [*Id.* at ¶¶ 79–80.] The final agreement included a recission clause, which provided that "[The] Employee may rescind this Agreement with (7) calendar days of the date on which Employee executes this document (the 'Revocation Period')." [Dkt. 191, ¶ 41; Dkt. 182-1 at 53–54.] Per Carpenter's edits, it also set Franklin's termination date on October 9, 2021. [Dkt. 194, ¶ 79.] Franklin filed this lawsuit during the negotiations on August 17, 2021. [Dkt. 1.]

Maximus terminated Franklin on October 9, 2021. [Dkt. 191, ¶ 44.] Blaschke knew Franklin had signed a negotiated severance agreement and understood that he

had resigned from the company.[6] [Dkt. 194, ¶ 83.] She determined that his position, Vice President – Child Support, was unnecessary and that eliminating it would improve the team's financial performance. Accordingly, HR closed the position permanently on October 11, 2021. [*Id.*] On October 12, 2021, Maximus received a letter from Franklin's counsel stating that he decided to rescind the Separation Agreement and "wishes to settle his claims against Maximus," but the current severance offer was "inadequate." [Dkt. 194, ¶ 81.] Maximus refused to allow Franklin to return because his position had been eliminated. [*Id.* at ¶ 84.] On December 6, 2021, Franklin filed a Third Amended Complaint, adding claims of retaliatory discharge under § 1981. [Dkt. 151.]

## III. Legal Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Frazier-Hill*, 75 F.4th at 801. When considering cross-motions for summary judgment, the Court views the facts in the light most favorable to the party against whom the motion under consideration is made. *Frazier-Hill*, 75 F.4th at 801. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477

---

[6]     Franklin disputes that Blaschke could have thought Franklin resigned because he "did not sign a letter of resignation" and Maximus terminated him. Franklin cites nothing in the record responsive to Maximus' factual statement. His response is one of legal argument about the interpretation of the agreement. Therefore, Maximus' statement about what Blaschke understood is deemed admitted. [Dkt. 194, ¶ 83.]

U.S. 242, 248 (1986); *see also Birch | Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022).

## IV.    Analysis

There are five claims left in this case: retaliation under Title VII and § 1981 (Counts I and II), retaliatory discharge under § 1981 (Count III), pay discrimination under § 1981 (Count V), and violation of Franklin's rights under the FMLA (Count X).[7] Maximus moves for summary judgment on all counts. Franklin moves for partial summary judgment on Count III. As noted above, if the Court views the record in Franklin's favor, Maximus is entitled to summary judgment on Count III. So, the same would be true if it viewed the record in Maximus' favor. Therefore, the Court views the record in Franklin's favor.

### A.    Pay Discrimination

Count V claims that Franklin's base salary, bonus payments, and overall compensation were consistently lower than that of white employees in violation of § 1981. Section 1981 "protects the right of all persons 'to make and enforce contracts' regardless of race…" *Carter v. Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015) (quoting 42 U.S.C. § 1981(a)). A plaintiff can prove discrimination under § 1981 the same way they can under Title VII: through direct or circumstantial evidence of intentional racial discrimination. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 878 n.39 (7th Cir. 2016). "When pursuing an unequal pay claim, the plaintiff must show that the protected grounds—here, race—caused the disparity in

---

[7]    Counts IV and VI are for punitive damages, but damages are a potential remedy, not a cause of action. Franklin voluntarily dismissed Counts VII, VIII, and IX. [Dkt. 199.]

compensation." *Palmer v. Indiana Univ.*, 31 F.4th 583, 589 (7th Cir. 2022). Franklin addresses causation using both the burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and the holistic method under *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Although *Ortiz* would be sufficient, *Palmer*, 31 F.4th at 589, the parties use both methods and so shall the Court.

Under the *McDonnell Douglas* burden shifting framework, a plaintiff must establish a prima facie case of discrimination by showing that 1) he is a member of a protected class; 2) he was meeting his employer's legitimate job expectations; 3) he suffered an adverse employment action; and 4) similarly situated employees outside his protected class were treated more favorably. The burden then shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pre-textual." *Bagwe*, 811 F.3d at 880 (internal quotation marks omitted).

Franklin easily meets the first two elements. The parties agree that he belongs to a protected racial class (black) and met Maximus' expectations. But his claim falters on the last element: "[A]n unequal pay claim begs for some comparator evidence: *unequal to what*?" *Palmer*, 31 F.4th at 590 (emphasis in original). Franklin must point to a comparator outside of his protected class who is "directly comparable to [him] in all material respects" but was paid more. *Id.* (cleaned up). Relevant factors are context-dependent but often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same

supervisor, and (iv) had comparable experience, education, and other qualifications, so long as the employer considered them. *Crain v. McDonough*, 63 F.4th 585, 592 (7th Cir. 2023) (quoting *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 226 (7th Cir. 2017)). Similar job responsibilities alone are not enough. *Warren v. Solo Cup Co.*, 516 F.3d 627, 631 (7th Cir. 2008).

At Maximus, Human Resources and Recruiting set and adjusted employees' salaries. [Dkt. 194, ¶ 13.] Depending on the role, a business leader may also have participated. [*Id.*] Each position was assigned a salary grade and range. Where a new employee fell in that range depended on their education, experience, location, other qualifications and salary demands, and, where lawful, prior salary. [*Id.*; Colbeck Dep. at ¶ 15.] Incumbent employees who were transferred or promoted into a new role might also receive an increase in base salary based on their education and experience as it related to the new role, salary history, compensation at the time of transfer or promotion, and the increase in role and responsibilities. [Colbeck Dep. at ¶¶ 16–17.]

Franklin denies that Maximus used education to increase salary within a salary band. [Dkt. 194, ¶ 13.] The parties dispute whether he can rely on his own declaration for this factual assertion. [Dkt. 201 at 6–7.] A declaration must be based on the declarant's personal knowledge to create an issue of fact. *Foster v. PNC Bank, Nat'l Assoc.*, 52 F.4th 315, 320 (7th Cir. 2022). Franklin explains that when he served as a hiring manager for "dozens of positions," Maximus used education to determine if an applicant was qualified for a job, but not to increase their salary within a salary band. [Dkt. 194, ¶ 13.] As Maximus notes, Franklin did not state what positions he

hired for or that he was involved in setting his proposed comparators' compensation. But viewing the record in Franklin's favor, it is reasonable to assume he hired for positions within his own group (Human Services) and was positioned to know what role education generally played in compensation. So, for the purposes of summary judgment, the Court will assume that Maximus did not use education to set employees' compensation.

Franklin also denies that Maximus relied on experience, location, prior salary, and other qualifications but cites no evidence, so Maximus' fact statement is admitted. *Id.*; Loc. R. 56.1(e)(3). A meaningful comparator for Franklin, then, is one whose salary differed from his despite having the same job responsibilities and supervisor, as well as experience, qualifications, prior salary, and geographic base.

Franklin proposes two peers (Peter Baylinson and Kelly Boerner) and four subordinates (James Graettinger, Daryl Reiber, Colleen Duke, and Rick DiLollo) as potential comparators. He has not shown that any are sufficiently similar. As a preliminary global issue, Franklin's approach to the comparator analysis is flawed. First, he argues that the named peers are comparable to himself solely based on similar "professional responsibilities and . . . goals," and, in some cases, a shared supervisor. [Dkt. 200 at 7.] He eschews any other factors. This is insufficient as a matter of law. Comparator analysis is designed to isolate animus. If an employer relies on non-discriminatory factors to set pay, those factors must be considered to "eliminate other possible explanatory variables" for a pay disparity other than racial

17

discrimination. *Crain*, 63 F.4th at 592 (quoting *Downing v. Abbott Lab'ys*, 48 F.4th 793, 805 (7th Cir. 2022)).

Franklin also argues that different job titles and duties don't disqualify a potential comparator. [Dkt. 200 at 6.] It's true that an employer can't rely on the singularity of a position to suggest there is no possible comparator. *Crain*, 63 F.4th at 592. But distinctive job functions are also relevant. *Id.* Ultimately, a plaintiff bears the burden of showing enough common factors between himself and another employee to enable meaningful comparison. This includes performing similar work, as well as other nondiscriminatory factors the employer used to inform compensation. With the legal framework clarified, the Court addresses each proposed comparator.

Peter Baylinson joined Maximus in 1994 and has worked in director-level or higher roles since 2012. From 2018 on, he was Vice President – Finance & Accounting. [Dkt. 194, ¶ 22; Dkt. 182-1 (Colbeck Decl.), ¶ 24.] Baylinson is white, [Dkt. 191, ¶ 9], and was consistently paid a higher salary as Vice President than Franklin. [Dkt. 194, ¶¶ 14, 23.] Maximus argues that Baylinson is not a comparator because his job substantially differed from Franklin's. Baylinson provided overall direction for the Child Support division's tax, insurance, budget, credit and treasury functions. He also provided operational support to a portfolio of contracts. [Dkt. 194, ¶ 22; Colbeck Decl. at ¶¶ 26–27.]

Franklin attempts to equate his and Baylinson's work, explaining that they had the same job title and supervisor (Rosenak), "manage[d] multiple projects within their portfolios," "emphasize[d] financial performance, "client satisfaction,"

18

"operational excellence," "focus[ed] on workforce stability," and "growth initiatives," and the like. [Dkt. 201 at 8–10.] But none of his factual assertions are supported by citation to any statement of fact or the record. It's not apparent where in the record they come from, so the Court disregards these statements. *See supra*, Part I. Even if Baylinson and Franklin's responsibilities were similar, their relative experience and prior salaries, which Maximus considered, were not. When they were promoted to Vice President in 2018, Baylinson was in a higher role (Senior Director as opposed to Director), had five more years of Director-level experience, and a higher salary. [Dkt. 201 at 7–8; Dkt. 194 at ¶¶ 11, 23.] Franklin did not respond to these points in his brief, and so has not shown Baylinson to be a valid comparator.

Next, Kelly Boerner had been Vice President – Operations Support since April 2021. She was previously Vice President – Business Development from 2019–2021 and Senior Director – Business Development from 2015–2019. [Dkt. 194, ¶ 24.] She reported to Kerr until 2021 and to Blaschke thereafter. [*Id.*] She is also white and was consistently paid more than Franklin. [*Id.* at ¶¶ 14, 25.] Maximus argues that Boerner was paid more than Franklin upon hire and promotion because she (1) performed additional business development tasks in the Human Services group in addition to her work as Vice President,[8] (2) had a different supervisor, (3) had seven

---

[8]     Franklin denies that Boerner performed additional business development tasks because she wasn't part of the Business Development department and didn't work with that department's Senior Vice President. [Dkt. 200 at 10.] But he doesn't cite to any evidence suggesting that business development tasks were solely centralized within that department, so Maximus' fact is admitted.

years of prior sales experience managing a $1.5 billion pipeline in operations,[9] (4) a higher prior salary, and (5) expected increased responsibilities due to a reduction in her team. [Dkt. 201 at 8; Dkt. 194, ¶ 24; Colbeck Decl. at ¶ 29.]

The major flaw in Franklin's response is that he makes no affirmative case for why Boerner is comparable to Franklin, even though it is his burden to bear. *Palmer*, 31 F.4th at 590. He doesn't argue that they were united by common tasks, supervisors, experience, or any other factor that informed employee pay. He does attack the amount of work Boerner did relative to him, arguing that additional work on top of her main role is irrelevant because "virtually all executives at [Maximus] maintained some ancillary role." [Dkt. 200 at 10.] But Franklin cites no evidence to support his assertion. Even if true, executives are "not interchangeable like widgets," and such a "broad generalization about tasks and skills," which purportedly applies to all Maximus executives, "fail[s] to satisfy [the plaintiff's] burden to show equal work." *Palmer*, 31 F.4th at 590 (quoting *Spencer v. Va. State Univ.*, 919 F.3d 199, 204, 208 (4th Cir. 2019)). And he has not addressed the other "litany of concrete differences" between them. *Id.* Consequently, Boerner is not a valid comparator.

Franklin initially argued that four subordinates were similarly situated but paid more than him during the 2018–2021 period: James Graettinger, Daryl Reiber, Colleen Duke, and Rick DiLollo each worked on the California Lifeline contract, which Franklin oversaw. Maximus explained in its motion for summary judgment

---

[9]     Franklin argues that Maximus should be estopped from relying on Boerner's prior experience because it moved to quash a subpoena for her employment records. [Dkt. 194, ¶ 25.] But Franklin provides no supporting argument, and her records were produced during discovery and are part of the record. [Dkt. 182-1 at 18–23.]

why the first three are not comparators. Graettinger's compensation was increased above Franklin's because he was being recruited by a competitor during a contract rebid and Maximus was concerned it would lose this bid without him. [Dkt. 184 at 14; Dkt. 201 at 9.] Duke and Reiber had higher salaries because they were transferred to California Lifeline from other divisions in Maximus where their preexisting salaries were higher. [Dkt. 184 at 14.] Franklin did not reply to these arguments or address these employees at all in his response brief. He has therefore abandoned his claims to each and failed to establish that they are comparators. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.")

Finally, Franklin presents Rick DiLollo, who was a Project Director on the California Lifeline contract since April 2021 and, prior to that, a Project Manager since 2020. [Dkt. 194, ¶ 18.] DiLollo is white. [Colbeck Decl., ¶ 70.] He and Franklin were both in the 8BN-compensation grade profile and received an 8B grade salary, except that DiLollo's base pay was higher. Franklin argues that he and DiLollo, much like Baylinson, shared similar responsibilities and goals such as "driving significant organizational growth," "maintaining high client satisfaction," "ensuring operational excellence," and emphasizing "client satisfaction" and "billing integrity." [Dkt. 200 at 7–8.] Consequently, he argues that they operated according to comparable standards. Again, Franklin failed to address any other factors Maximus used to calculate DiLollo's compensation, such as his specific experience and salary demands. The

evidence shows that Maximus hired DiLollo to manage Solix, Inc., an IT subcontractor on the California Lifeline contract, due to his 19 years of experience at Solix and with the Solix platform, particularly because the contract had significant technology issues with Solix. [Dkt. 201 at 7; Dkt. 194, ¶ 18; Colbeck Decl. at ¶ 35.] The evidence Franklin cites to dispute this (DiLollo's October 16, 2020 performance evaluation) doesn't speak to his salary and, to the contrary, confirms that he was a value-add for Maximus' Solix problem. [Dkt. 187 at 185–87.] By contrast, Franklin had fewer years of professional experience in areas related to his work at Maximus and has not shown that he was similarly retained to meet specific and urgent project demands. Therefore, Franklin has not shown that DiLollo was similarly situated to him. Without a comparator, Franklin has not shown similarly situated employees outside his protected class were treated more favorably when it came to pay.

*Ortiz* leads to the same conclusion. Using *Ortiz*, the Court asks whether there is direct or circumstantial evidence of discrimination that would "permit a reasonable factfinder to conclude" that racial discrimination caused the disparate pay. 834 F.3d at 765. Circumstantial evidence could include "ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; [or] dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). Franklin hasn't pointed to direct evidence of discrimination or, as above, shown that similarly situated people were treated differently. His single argument for pretext is that Maximus tried to conceal the fact that his subordinates' salaries were higher using unofficial reporting

22

and "dotted line" organizational charts. [Dkt. 200 at 6.] "For instance, prior to being reassigned to Workforce Services Division . . . Franklin was the assigned executive of the CA Lifeline Project . . . Despite holding the title of VP . . . the project manager and director [Colleen Duke] officially reported to Franklin's manager, Rosenak." [*Id.*] Neither this statement nor the factual statements cited in support reveal dishonesty or explain how Maximus tried to hide any information. It was no secret that Duke reported to Rosenak, [Dkt. 191, ¶ 70], and that she did has nothing to do with concealing information about salaries.[10]

Overall, a reasonable jury could not find that Maximus paid Franklin less than other employees due to racial discrimination. Maximus is entitled to summary judgment on Count V.

## B. Retaliation

Next, Maximus moves to dismiss Franklin's retaliation claims. Count I is a Title VII retaliation claim alleging that Maximus engaged in various non-discharge adverse actions against Franklin. Counts II and III are § 1981 claims for retaliation involving termination and "retaliatory discharge." Franklin moves for summary judgment on Count III. Although Franklin raised three claims, there is only one before the Court. First, Franklin abandoned Count I by failing to defend it in his response brief. *Nichols*, 755 F.3d at 600. Maximus addressed multiple alleged protected activities and adverse actions listed in Count I, but Franklin did not

---

[10]    Franklin makes other arguments about hidden salary discrepancies, [Dkt. 185 at 9–10], but they are wholly uncited and it's unclear where the factual assertions come from, so the Court disregards them.

respond to any of them. [Dkt. 184 at 14–21; Dkt. 200.] Instead, his response focuses on one protected activity (filing a lawsuit) and one adverse action (termination), which are germane to Counts II and III, not Count I. Franklin also addresses § 1981 but not Title VII, further confirming that he has abandoned Count I.

Next, Counts II and III are duplicative. A claim is duplicative if the parties, operative facts, injury, elements of proof, and requested relief do not significantly differ. *Barrow v. Blouin*, 38 F. Supp. 3d 916, 920 (N.D. Ill. 2014); *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 919 (N.D. Ill. 2013). Here, Franklin alleges identical facts and requests the same relief under § 1981 in Counts II and III. Indeed, the counts are nearly word-for-word save for some protected activities listed in Count II that Franklin nevertheless raises in his cross motion on Count III. [*Compare* Dkt. 151, ¶ 316 *with* Dkt. 185 at 5–9 (arguing that Franklin's participation in the Stith investigation is protected activity).] Franklin also sets forth identical elements of proof when addressing Count II in his response to Maximus' motion and Count III in his cross-motion. [Dkt. 200 at 11–12; Dkt. 185 at 3.] For simplicity's sake, the Court will treat Counts II and III as one § 1981 retaliation claim and consider all arguments made about to one to apply equally to the other. *See Reid*, 964 F. Supp. 2d at 919 ("Generally, district courts are accorded a great deal of latitude and discretion to dismiss duplicative claims.") (internal quotation marks omitted).

Section 1981 prohibits racial discrimination in the making and enforcing of contracts. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). It also prohibits employer retaliation against an employee for opposing impermissible racial

24

discrimination. *Id.*; *see also CBOCS W., Inc. v. Humphries*, 553 U.S. 442 (2008) (interpreting § 1981 to permit retaliation claims). To prevail on a § 1981 retaliation using the direct method, which both parties employ, Franklin must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the two. *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 761 (7th Cir. 2022). In contrast to a Title VII claim, under § 1981, race must be a but-for cause of the termination. *Id.* at 759.

### 1.     Protected Activity

An employee engages in protected activity when he takes "some step in opposition to" employment-related racial discrimination. *O'Leary*, 657 F.3d at 631. Paradigmatic protected activities include "(1) filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes; or (2) opposing an unlawful employment practice." *Northington v. H&M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013); *Lawrence v. ZionSolutions LLC*, 2021 WL 4988654, at *7 (N.D. Ill. Oct. 27, 2021) (applying Title VII definition to § 1981 claim). Even informal complaints may constitute protected activity, *Davis v. Time Warner Cable of S.E. Wisc., L.P.*, 651 F.3d 664, 674 (7th Cir. 2011), however, "[v]ague and obscure 'complaints' do not." *Northington*, 712 F.3d at 1065. An employee need not show that what he opposes is truly a statutory violation so long as his opposition is based on a good-faith and reasonable belief that he is opposing unlawful conduct. *O'Leary*, 657 F.3d at 631.

Franklin claims that he engaged in protected activity when he: (1) participated in the Stith investigation; (2) informally complained to various Maximus executives

about retaliation based on his participation in the Stith investigation; (3) submitted internal complaints to Maximus' EthicsPoint portal based on racial discrimination and retaliation; (4) filed an EEOC complaint based on racial discrimination and retaliation; and (5) filed this lawsuit.[11] Maximus takes issue with each.

First, Maximus argues that Franklin's role in the Stith investigation is not protected activity. As it rightly notes, internal investigations are only protected if the employee acted in opposition to prohibited discrimination. *O'Leary*, 657 F.3d at 631. Franklin argues that he did. Stith made a complaint against Rosenak, his supervisor, concerning his workload and racial discrimination that spurred an internal investigation. In Franklin's telling, he believed that Rosenak also made a meritless cross-complaint against Stith based on the call Franklin received from Baylinson telling him to take Rosenak's side in the investigation. [Dkt. 185 at 6.] When HR called Franklin during the investigation and asked whether he had seen Stith being aggressive towards Rosenak, Franklin "refused to corroborate Rosenak's claims," he argues, to oppose her attempt to retaliate against Stith for his claims of racial discrimination. [Dkt. 185 at 5–7.] However, the undisputed record shows that Franklin refused to participate in the investigation because he feared that opposing his supervisor would negatively impact his job, not because he thought he was opposing discrimination. First, there's no evidence that he knew Stith complained about racial discrimination. Although he originally testified that HR asked if he'd ever "observed" Stith complain of discrimination in which other people were promoted

---

[11]     The Third Amended Complaint lists a litany of other alleged protected activities, but Franklin raised none of them in his briefs, so any argument based on them is forfeited.

ahead of him despite him being the "most qualified African American person for the job," [Dkt. 191, ¶ 10; Franklin Dep. 1 at 142:09–18], Franklin later recanted, explaining that he'd misconstrued facts, and that Stith didn't mention racially discriminatory promotions to him until *after* the investigation. [Dkt. 194, ¶ 31.] Franklin didn't cite any other way he would have known the content of Stith's complaint, so his belief that he opposed discrimination is not objectively reasonable. *Vavra v. Honeywell Int'l, Inc.*, 106 F.4th 702, 705–06 (7th Cir. 2024) ("[A]n employee must have some knowledge of the conduct he is opposing for his belief to be objectively reasonable."). Franklin also directly stated in his deposition that "I asked to be left out of that investigation because I knew it was going to end my career." [Dkt. 194, ¶ 31.] Based on Franklin's own knowledge and statements then, it is implausible that he was motivated by opposition to discrimination. Consequently, neither Franklin's role in the Stith investigation nor his complaints about retaliation based on it are protected.

Next, Maximus argues that the complaints Franklin submitted to Maximus' internal EthicsPoint portal and the EEOC and this lawsuit are not protected because they're baseless. [Dkt. 190 at 10–11.] The Seventh Circuit has repeatedly stated in the Title VII context that "utterly baseless claims do not receive protection" because the statute was designed to protect employees who protest in good faith, not to "arm employees with a tactical coercive weapon.*" Brooks v. City of Kankakee, Ill.*, 7 F.4th 649, 660 (7th Cir. 2021) (cleaned up); *see also Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 890–91 (7th Cir. 2004) (applying this standard to both the opposition and

participation clauses). A claim does not necessarily lose statutory protection if it fails, for example, because an employee is mistaken about the merits of a claim or drafts a complaint as best they can that is nevertheless deficient. *Brooks*, 7 F.4th at 660–61. Rather, "utterly baseless" is generally reserved for meritless claims that are maliciously filed, based on deliberate falsehoods, or fail to even describe a prohibited act. *See, e.g.*, *id.* at 662 (plaintiff's meritless retaliation complaint that included factual falsehoods not protected); *Mattson*, 359 F.3d at 892 (meritless sexual harassment complaint motivated by bad faith not protected); *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 746 (7th Cir. 2010) (sex discrimination complaint that did not describe sex discrimination not protected); *Isbell v. Baxter Healthcare, Corp.*, 273 F. Supp. 3d 965, 979–80 (N.D. Ill. 2017) (sexual harassment complaint describing general harassment of a nonsexual nature not protected).

Franklin's internal and EEOC complaints allege racial discrimination and retaliation based on Maximus' failure to promote Franklin to a Lead VP position.[12][13] [Dkt. 191, ¶¶ 31–32.] Maximus argues that they are baseless because Franklin complained about his failure to be promoted without knowing the qualifications of the people (Kim, Simmons, and Zietlow) who were promoted instead. It's true that

---

[12]     Franklin's brief, [Dkt. 185 at 9–11], purports to describe the April 2021 EthicsPoint complaint, but none of the details appear in that complaint [Dkt. 182-13.]. As Franklin didn't include a single citation in this part of his brief and it's unclear where this information comes from, the Court disregards it and only considers the April 2021 complaint cited in Franklin's statement of facts [Dkt. 191].

[13]     Franklin's EEOC complaint includes what appears to be an earlier internal complaint filed against Rosenak that alleges retaliation based on Franklin's participation in the Stith investigation and complaints he made about nepotism. As neither relate to racial discrimination, this embedded complaint is not protected activity. [Dkt. 187 at 314–17.]

Franklin's failure to promote claims as presented don't appear to have much merit. Franklin admitted that he didn't know Kim's qualifications. [Franklin Dep. 1 at 217:3–24.] And Franklin jumped the gun on multiple retaliation claims at Maximus. For example, he complained that Rosenak's proposed reorganization was "retaliatory" before it was implemented and despite her nondiscriminatory reasons for planning to post a position Franklin desired. [Dkt. 194, ¶¶ 41, 43–44, 47–49.] He also now claims that Maximus' failure to promote him wasn't retaliation at all, even though he said as much in his deposition. [Dkt. 194, ¶¶ 71–72; Franklin Dep. 1 at 275:1–5, 277:1–279:11.] But Franklin's complaints aren't completely groundless. They describe a promotion process that appears controlled, claim he had more experience than those ultimately chosen, and list employee comments suggestive of racial bias. If true, his complaint would have a "valid core." *Hatmaker*, 619 F.3d at 746. Having been a Vice President at Maximus, it's not unreasonable that Franklin thought he was qualified for promotion. That he was wrong about the relative qualifications of others doesn't make his claim groundless. Nor has Maximus argued that he knowingly or maliciously filed bogus claims. Franklin's lawsuit, which originally included claims of discrimination based on a failure to promote, is protected for the same reason.

In sum, Franklin's internal complaint, EEOC complaint, and lawsuit are protected activities under § 1981, but his participation in and complaints based on the Stith investigation are not.

## 2. Causation

Next, Franklin must casually connect his protected activities to an adverse action. Causation may be shown with direct evidence, such as an overt admission of

animus, *O'Leary*, 657 F.3d at 630, or circumstantial evidence, such as suspicious timing, ambiguous statements of animus, evidence that other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual. *Lewis*, 36 F.4th at 761. "Ultimately, '[t]he key question is whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action.'" *Id.* (quoting *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019)).

Franklin argues that because of his complaints and lawsuit, Maximus involuntarily terminated his employment by refusing to honor the recission clause in his Separation Agreement. [Dkt. 200 at 12.] To recap, Franklin asked for and initiated severance negotiations in June 2021 after Maximus failed to promote him. [Dkt. 194, ¶ 76.] On October 8, 2021, he signed a Separation Agreement that would terminate his employment and waive claims against Maximus. [*Id.* at ¶ 80.] Franklin then reneged on the agreement pursuant to a recission clause. [*Id.* at ¶ 81.] Maximus, having already eliminated his position, refused to re-employ him and argued that the recission clause only applied to his waiver of claims. [*Id.* at ¶ 82; Dkt. 190 at 13.] The parties dispute whether Franklin's termination was involuntary and thus an adverse action. But even assuming that it was, Franklin's claim fails on causation.

First, Franklin cites comments made by Maximus employees as direct evidence of retaliation for Franklin's internal and EEOC complaints. During the severance negotiations, Franklin's counsel emailed Maximus counsel Nathalie Ohanian describing Franklin's complaints and stating that Franklin "believes that it is in the

best interests of both parties to go in different directions." [Dkt. 194, ¶ 76.] Ohanian

responded on July 21, 2021, explaining that Maximus conducted a third-party

investigation of Franklin's claims and found them meritless. She also stated:

> "[G]iven your request for severance . . . coupled with Mr. Franklin's request for
> an extended leave of absence through the end of the fiscal year, we are open to
> discussing a reasonable resolution of Mr. Franklin's perceived claims . . . [I]t is
> clear that Mr. Franklin does not see his current work environment as being
> positive or productive. To that end, we agree that it is best for both parties to
> part ways amicably . . ." [Dkt. 187-2 at 4–5.]

Franklin argues that Ohanian's suggestion that "it was best for both parties to part

ways," indicated that Maximus was aware of Franklin's complaints and that those

complaints influenced Maximus' decision to terminate him. [Dkt. 185 at 16–17.] This

is illogical. Ohanian simply agreed that it was best for Franklin to leave since he

indicated it was his preference. No reasonable fact finder could conclude otherwise.

It certainly does not show that Maximus wanted to terminate Franklin because of

the complaints. Furthermore, Franklin initiated the severance negotiations—

agreeing to his request was not retaliation without more.

After Franklin tried to rescind the Separation Agreement, Kerr, Human

Services Group President, stated that Franklin was no longer at Maximus because

he resigned. When asked why he resigned, she stated that he "was not happy" and

"felt that he was not being given appropriate opportunities." [Dkt. 191, ¶ 47.]

Franklin argues that this is also direct evidence that Maximus terminated Franklin

for his complaints. [Dkt. 185 at 17.] This doesn't follow. Kerr was explaining why she

thought Franklin voluntarily left the company. She did not say or indicate that

Maximus refused to reinstate him for this reason. And mere awareness that Franklin had grievances is insufficient to show retaliation because of those grievances.

Franklin marshals a few other stray comments to show that Maximus terminated Franklin for filing this lawsuit, but none reasonably infer retaliatory animus or pretext. On August 6, 2021, Franklin's counsel emailed Ohanian with a suggested severance sum. [Dkt. 194, ¶ 78.] Ohanian responded on August 27, 2021, shortly after Franklin filed suit, communicating, among other things, that Maximus' third-party investigation didn't substantiate his claims. [Dkt. 182-27 at 50–51.] Franklin argues that her "dismissive[ness]" was pretextual, particularly because it came on the heels of his lawsuit.[14] [Dkt. 200 at 12–13.] However, close timing alone is insufficient to show pretext. *O'Leary*, 657 F.3d at 629. And Ohanian had already told Franklin's counsel about the third-party investigation months before the lawsuit. [Dkt. 187-2 at 4.] Maximus' view of the investigation predated the case and cannot be causally linked to it.

Finally, Franklin argues that Blaschke, who decided to eliminate Franklin's position after he was terminated, demonstrated retaliatory intent by stating that she "did not want to permit Plaintiff to rescind his resignation." [Dkt. 200 at 13.] This statement is taken out of context. Blaschke explained, and Franklin did not dispute, that she eliminated Franklin's position for nondiscriminatory efficiency reasons— replacing him would affect the team's financial performance and she found that the

---

[14] Franklin also claims Maximus refused to share work product from the investigation and that this shows further pretext. [Dkt. 200 at 12–13.] Franklin provides no citation for this factual assertion, so it is disregarded.

team was operating well without his position. She stated that she didn't want to allow Franklin to come back because he'd already been terminated, she "requested that the position be closed, and [ ] had no intentions to fill his role." [Dkt. 194, ¶ 84; Dkt. 182-4 (Blaschke Decl.), ¶¶ 54–55.] In other words, it was a business calculation. Although Franklin argues that he was a "rockstar" employee, implying that his sudden obsolescence was suspicious, [Dkt. 196 at 4], he does not dispute Blaschke's belief that he resigned or her reasons for eliminating his position, so her comments are admitted and cannot reasonably be considered pretextual. He also failed to establish that Blaschke was even aware of his lawsuit, [Dkt. 201 at 13], making it impossible that any retaliation on her part was because of it.

Finally, Franklin suggests that Maximus acted in bad faith by not letting Franklin rescind his Separation Agreement. [Dkt. 200 at 13.] But Maximus claims that it has never let an employee rescind a signed Separation Agreement. [Dkt. 194, ¶ 82.] Franklin does not dispute this argument or explain why following Maximus' usual policy in this instance indicates pretext. Franklin has failed to show that Maximus would have refused to negotiate severance or let him rescind the Separation Agreement but for his complaints of racial discrimination and retaliation or this lawsuit. Maximus is entitled to summary judgment on Counts I–III.

## C.    FMLA Claim

Franklin's Third Amended Complaint claims that Maximus interfered with his FMLA rights by terminating him instead of restoring him to his position after taking FMLA leave. [Dkt. 151, ¶¶ 412–424.] As Maximus correctly argues, Franklin makes no attempt to develop or defend his FMLA claim in response to Maximus' summary

33

judgment motion, [*see* Dkts. 184 at 20; 201 at 2–3], so he has abandoned this claim. *See Little v. Mitsubishi Motors North Amer., Inc.*, 261 F. App'x 901, 903 (7th Cir. 2008) (plaintiff who "failed to present facts or develop any legal arguments" as to certain claims in response to motion for summary judgment deemed to have abandoned them). Maximus is entitled to summary judgment on Count X.

## V.      Conclusion

For the foregoing reasons, Maximus' motion for summary judgment [Dkt. 181] is granted. The Court has construed the record in the light most favorable to Franklin in ruling on Franklin's cross motion. Therefore, when the Court views the record in the light most favorable to Maximus, it is clear that Franklin is not entitled to summary judgment, so his motion for summary judgment [Dkt. 185] is denied. Judgment shall enter in favor of Maximus and against Franklin. Civil case terminated.

Enter: 21-cv-4367
Date:  December 11, 2024

_____
Lindsay C. Jenkins
United States District Judge